1
2
3
4                                                                              JS-6
5
6
7                          UNITED STATES DISTRICT COURT
8                        CENTRAL DISTRICT OF CALIFORNIA
9

10   LEVERAGE HEALTH                    CASE NO.  CV-16-9058-JFW (FFMX)
     SOLUTIONS, LLC, RICHARD
11   LUNGEN, CHARLES FALCONE
     and DAVID REILLY,                  **JUDGMENT**
12
                Petitioners,
13
            *v.*
14
     MEDVERSANT TECHNOLOGIES,
15   LLC,

16              Respondent.
17

18          The Court, having considered the Petition and the Application to Confirm

19   Arbitral Award (collectively "Petition") filed by petitioners Leverage Health

20   Solutions, LLC ("LHS"), Richard Lungen, Charles Falcone and David Reilly

21   (collectively "Petitioners"), the papers filed by respondent Medversant

22   Technologies, LLC ("Respondent"), and for good cause appearing, the Court

23   hereby GRANTS the Petition.  Judgment shall be and is entered as follows:

24

25          1.     The Final Arbitration Award (including the Statement of Reasons

26   thereto) issued by the American Arbitration Association awarding $340,528.35

27   ("Award Amount") to LHS and against Respondent, attached hereto, is hereby

28

                                                                          **JUDGMENT**

confirmed in its entirety, and is and shall hereby operate as a fully enforceable Judgment issued by this Court.

2.    To the Award Amount shall be added post-award, pre-judgment interest, pursuant to C.C.P. § 3287(a), from November 1, 2016 to February 3, 2017, in the amount of $6,733.80.

3.    The total monetary amount of this judgment shall be reduced by $1,925.00, the amount the Arbitrator ordered Petitioner to reimburse Respondent for AAA fees and costs paid by Respondent in excess of its share.

4.    Based on the above, the total monetary award to LHS based on this Judgment is **$ 345,337.15**.

5.    LHS shall also be entitled to post-judgment interest, pursuant to 28 U.S.C. § 1961, to be calculated from the date of this Judgment to the date of payment by or collection from Respondent in satisfaction of this Judgment.

**IT IS SO ORDERED, DECREED AND ADJUDGED.**

Dated: February 7, 2017

_____
John F. Walter
United States District Court Judge

2

] JUDGMENT

**AMERICAN ARBITRATION ASSOCIATION**

**Commercial Arbitration Tribunal**

| | |
|---|---|
| MEDVERSANT TECHNOLOGIES, LLC, | ) |
| Claimant | ) |
| v. | )   Case No. 01-14-0000-4610 |
| LEVERAGE HEALTH SOLUTIONS, LLC, RICHARD LUNGEN, CHARLES FALCONE, and DAVID REILLY, | ) |
| Respondents | ) |
| LEVERAGE HEALTH SOLUTIONS, LLC, | ) |
| Counter-Claimant | ) |
| v. | ) |
| MEDVERSANT TECHNOLOGIES, LLC | ) |
| Counter-Respondent. | ) |

## FINAL ARBITRATION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and having been duly sworn, and having duly read and considered the proofs and allegations of the Claimant and Counterrespondent Medversant Technologies, LLC ("Claimant" or "MV"), on the one hand, and the Respondent and Counterclaimant Leverage Health Solutions, LLC ("LHS") and Respondents Richard Lungen and Charles Falcone (collectively "Respondents"), on the other hand, hereby make this FINAL ARBITRATION AWARD as follows:

1. The claims and counterclaims in this arbitration are arbitrable pursuant to paragraph 30 of the Interim Business Development and Marketing Agreement among the parties dated January 25, 2010, and pursuant to an order compelling arbitration entered by the United States District Court for the Eastern District of Pennsylvania, in an action entitled *Medversant Technologies, Inc. v. Leverage Health Solutions, LLC, et al,* Case No. 15-1057.

2. The parties agreed that the Commercial Arbitration Rules of the American Arbitration Association ("AAA") effective October 1, 2013 and California substantive law apply in this arbitration.

1

3. The applicable pleadings in this matter are (i) Claimant's Consolidated Statement of Claims dated October 15, 2015; (ii) Respondents' Answer and Affirmative Defenses to the Consolidated Statement of Claims dated October 30, 2015; and (iii) Respondent's Counterclaims dated June 6, 2014.

4. Pursuant to Case Management Order No. 6 dated April 28, 2016, Claimant voluntarily dismissed without prejudice its Fifth Claim for Relief (Fraud), Eighth Claim for relief (Misappropriation of Trade Secrets) and Ninth Claim for Relief (Civil Conspiracy) alleged in the Consolidated Statement of Claims.

5. The Consolidated Statement of Claims names David Reilly as a Respondent.  Certain claims against Mr. Reilly were dismissed without prejudice pursuant to Case Management Order No. 6 as described in paragraph 4 above.  The remaining claims against Mr. Reilly were dismissed with prejudice pursuant to a stipulation of the parties and order thereon dated July 29, 2016.

6. The evidentiary hearing in this matter was held on May 23, 24, 25 and 26, 2016.  The parties submitted post-hearing briefs on July 22, 2016, and stipulated that the arbitrator have until August 31, 2016 to issue an interim award on all liability and damages claims, but that any claims for awards or allocations of attorneys' fees and costs would be determined separately following issuance of this award.  The arbitrator issued an Interim Award dated August 30, 2016 (the "Interim Award").  This Final Award is intended to incorporate and be fully consistent with the Interim Award.  Following issuance of the Interim Award, LHS served a motion for an award of attorneys' fees and costs and for prejudgment interest.  Respondent submitted an opposition to this motion on October 31, 2016 and the hearing was closed effective November 1, 2016.  The arbitrator's rulings on the motion for fees, costs and prejudgment interest is set forth in paragraphs 14 through 18 of this Final Award.

7. The claims submitted for decision at the hearing are (i) MV's claims for breach of contract, breach of fiduciary duty, rescission of Amendment No. 1 to the Interim Business Development and Marketing Agreement, declaratory judgment respecting commissionability of certain customers, unfair competition and intentional interference with prospective economic advantage, and (ii) LHS's counterclaims for breach of contract and declaratory relief.

8. The arbitrator finds against MV and in favor of LHS on MV's claims in this arbitration, and MV shall not recover monetary damages or other relief on such claims.

9. The arbitrator finds in favor of LHS and against MV on LHS's counterclaims in this arbitration.

10. LHS shall recover compensatory damages from MV in the amounts of $151,161.92, representing unpaid retainer amounts and expenses due under the Agreement, and $107,557.93, representing unpaid commission amounts in excess of the monthly retainer amounts, due under the Agreement, for a total compensatory damages award of $258,719.85.

11. It is declared that MV materially breached the Agreement from and after April 2013 by failing to pay monthly retainers LHS's reimbursable expenses and commissions, thereby excusing and discharging LHS from its obligations under the Agreement.

2

12. It is declared that four MV customers—Amerigroup, Cigna, Molina (W. Va.) and NCPDP—were commissionable customers and that, therefore, LHS is entitled to recover commissions respecting these customers as awarded in paragraph 10 above.

13. LHS is the prevailing party in this arbitration.

14. LHS's request for an award of AAA fees and arbitrator's fees is denied. The parties' Agreement provides that the parties will share equally the costs of the arbitration. This provision applies to AAA fees and arbitrator's fees, and takes precedence over the language of the Commercial Rules. The administrative fees of the American Arbitration Association totaling $12,550.00, and the compensation of the arbitrator totaling $69,000.00 shall be borne equally. Therefore, Leverage Health Solutions, LLC shall reimburse Medversant Technologies, LLC the additional sum of $1,925.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Medversant Technologies, LLC.

15. LHS's request for an award of its attorneys' fees and costs is denied. The parties' Agreement does not contain a provision entitling the prevailing party to an award of its attorneys' fees and costs. LHS contends that under applicable California and federal law the arbitrator has the authority to award attorneys' fees and costs based on Medversant's alleged bad faith assertions of meritless claims and defenses in this arbitration. Assuming, *arguendo*, that the arbitrator has such authority, the arbitrator finds, based upon all of the evidence introduced at the hearing, that while Medversant did not prevail on its claims and defenses in this arbitration, it did not assert those claims and defenses frivolously or in bad faith. Accordingly, LHS is not entitled to an award of its attorneys' fees and costs.

16. LHS is not entitled to an award of attorneys' fees and costs it incurred in defending against the trade secret and fraud claims that were dismissed without prejudice prior to the hearing. Case Management Order No. 6 provides that such an award would be made only as to fees incurred for services that could not be used in any future litigation or arbitration of the dismissed claims. LHS has not carried its burden of showing that the services it incurred in this arbitration could not be used in such potential future litigation or arbitration.

17. LHS shall recover prejudgment interest at a rate of 10% per annum on the amount awarded pursuant to paragraph 10 of this award. The amounts awarded were certain or capable of being made certain within the meaning of Section 3287(a) of the California Civil Code. The amount of such interest is $81,808.50 through October 31, 2016. See Affidavit of David R. Moffitt, Exhibit B. Such interest shall continue to accrue at a rate of 10% per annum until paid.

18. LHS request for an award of certain fees and expenses incurred in connection with Medversant's alleged inadvertent production of privileged documents is denied.

19. The arbitrator's reasons for this award are summarized in the Statement of Reasons below.

3

20. This award is intended to determine all claims submitted to the arbitrator for decision.  Any claim or defense not mentioned herein or in the Statement of Reasons below is denied.


DATED: November 9, 2016

Richard R. Mainland
Arbitrator

## STATEMENT OF REASONS

### I.   FACTUAL BACKGROUND

Medversant ("MV") is engaged in the business of providing credentialing and data management services in the health care industry.  It assists health plans and other health care organizations in the credentialing of health care providers, such as physicians.  MV has developed proprietary technology to perform these services.  Matthew Haddad has at all relevant times been CEO of MV.

Leverage Health Solutions, LLC ("LHS") provides business development and marketing services to a variety of health care firms.  Respondents Richard Lungen and Charles Falcone are principals and executives of LHS.

In 2009 MV wanted to expand its business and was introduced to LHS.   MV and LSH negotiated and executed an Interim Business Development and Marketing Agreement dated January 20, 2010.  Ex. M5.[1]  Pursuant to the agreement, MV agreed to provide a variety of marketing services aimed at expanding the sales of MV's services to healthcare organizations.  *Id.*, ¶ 1.   The agreement required LHS to produce at least 18 "TLG Prospects"[2] during a 12-month "retainer" period and to maintain an "active sales dialogue" with at least two "Prospects" per month thereafter.  The agreement defined "LHS Prospects" to include a requirement that the Prospects "have been reviewed and approved by Medversant via email or other written communication acknowledgment from Matthew Haddad, CEO of Medversant."  *Id.*, ¶ 2(a).

MV agreed to pay LHS a monthly retainer of $5,000, and commissions of 7% of MV's gross revenues from LHS Prospects, payable 30 days from the end of the month in which MV received revenue from the client.  *Id.*, ¶ 3.  If any Prospect was not sold any MV solutions within a 12-month period from the time of MV's approval, then the Prospect would no longer be commissionable under the agreement.  *Id.*, ¶ 2(b).

The Agreement was not exclusive.  MV could originate new business on its own, without any obligation to LHS.  LHS could provide its business development services to other clients, and did so, with MV's knowledge.  However, LHS could not represent organizations that competed with MV's services during the term of the agreement and for one year after termination (or one year from the last payments made under the agreement).  *Id.*, ¶ 13.

The agreement provided that any disputes with respect over performance of the Agreement would be resolved by AAA arbitration.  *Id.*, ¶ 30.

On or about December 14, 2011, the parties executed Amendment No. 1 to the agreement.  Ex. M10.  The amendment increased LHS' compensation to a retainer of $15,000 per month and commissions of 10% of MV's gross revenues from LHS Prospects.  In addition, the amendment

---

[1] In this Award, MV's exhibits are designated "Ex. M__" and LHS's exhibits are designated "Ex. L__".
[2] "TLG" in the agreement referred to "The Lungen Group," the former name of LHS.  To avoid confusion, "TLG Prospects" are referred to herein as "LHS Prospects."

gave LHS the right to acquire up to a 2% "equity participation interest" in MV and provided for a separate 3.5% commission for any equity investment in, or acquisition of, MV by a source identified by LHS. *Id.*, ¶¶ 8-9.  The amendment left the original agreement in effect except as modified by the amendment.[3]

The parties' initial experience was generally satisfactory.  LHS introduced MV to a large number of potential customers, several of which contracted for MV's services.  Over the next two years, however, the relationship began to sour.   The first MV customer developed by LHS, Wellcare Health Plans, Inc. ("Wellcare"), terminated its agreement with MV for cause.  A major contract with Cigna, entered into in December 2012, was troubled from the outset, and there was a certain amount of "finger-pointing" between MV and LHS. In April 2013, MV stopped paying monthly retainers and commissions to LHS.  In January 2014, Cigna terminated its contract with MV for cause, depriving MV of millions of dollars of revenues and LHS of substantial commissions.  This arbitration ensued.

## II.   **PROCEDURAL HISTORY**

MV brought this arbitration on May 19, 2014.  It filed a form demand with the AAA, describing the dispute as "Breach of Contract and Default Resulting in Damage; Interference with Contract Resulting in Loss of Prospective Economic Advantage;  Professional Negligence."  The demand made no specific supporting allegations and sought $300,000 in damages.

On June 6, 2014, LHS filed a counterclaim seeking to recover unpaid retainer amounts and commissions under the Agreement, a declaration of its rights to future commissions and a declaration that MV had breached  the Agreement, thereby excusing LHS of any duty to perform under the Agreement.

On or about October 14, 2014, MV filed an "Expanded Statement of Claims and Offsets," alleging that LHS had materially breached the Agreement and had breached fiduciary duties owed to MV, seeking rescission of Amendment No. 1 for fraud, and requesting a declaration that only one customer, Wellcare, ever qualified as an LHS Prospect under the agreement and that LHS was not entitled to commissions respecting any customers other than Wellcare.  LHS filed an Answer to the Expanded Statement of Claims, denying the material allegations.

On November 20, 2014, MV served a Motion for Summary Adjudication, seeking a declaration that LHS was not entitled to commissions for any customer other than Wellcare.  MV requested leave to file this motion pursuant to Rule R-33 of the AAA's Commercial Arbitration Rules.  LHS opposed this request.  After a telephonic hearing with the parties, the arbitrator denied MV's request to file a dispositive motion, without prejudice to MV asserting its position respecting commissionability of customers at the merits hearing.  Case Management Order No. 2 dated November 21, 2014, ¶ 1.

On March 2, 2015, MV filed an action in the United States District Court for the Eastern District of Pennsylvania, entitled *Medversant Technologies, Inc. v. Leverage Health Solutions,*

---

[3] Unless otherwise stated, the term "Agreement" as used in this award refers collectively to the original Interim Business Development and Marketing Agreement and Amendment No. 1.

*LLC, et al,* Case No. 15-1057 (the "Federal Action"). In its complaint, MV alleged that LHS had represented it in dealings with a healthcare company, Optum and its credentialing subsidiary, Aperture Credentialing, LLC ("Aperture"). MV alleged that this representation including pursuing Aperture as an acquisition for MV, but that the defendants, in violation of their duties to MV, had instead acquired Aperture for themselves and, in the process had misappropriated valuable trade secrets belonging to MV. The complaint named as defendants LHS, Richard Lungen, Charles Falcone, David Reilly and Aperture.

The defendants moved to compel arbitration of the claims alleged by MV in the Federal Action. MV opposed the motion. Motion proceedings extended over a period of several months and by the agreement of the parties the arbitration was stayed pending a ruling on the motion. In an order dated July 20, 2015, the court granted the motion and ordered MV to arbitrate its claims against LHS and the related individuals in arbitration.[4]

MV added its claims in the federal court action to this arbitration, and ultimately asserted those claims (as well as the claims previously asserted against LHS) in a Consolidated Statement of Claims dated October 15, 2015. LHS and Lungen, Falcone and Reilly, submitted an amended Answer to the Consolidated Statement, denying any liability to MV.

At a conference on October 8, 2015, a schedule was established, including an April 15, 2016, cutoff date for non-expert discovery, an April 1, 2016, date for designation of expert witnesses, and a 14-day merits hearing commencing May 9, 2016. See Case Management Order No. 4.

As contemplated in the Case Management Order, the parties conducted discovery, both by exchanging documents (including ESI), and the taking of depositions. Expert witnesses were designated and deposed by both sides.

Prior to the hearing, MV requested leave to voluntarily withdraw its claims for fraud, trade secret misappropriation and civil conspiracy without prejudice. The arbitrator granted MV leave to dismiss these claims without prejudice, subject to certain conditions. Case Management Order No. 6, ¶ 1. In light of the dismissed claims, the parties reduced their estimate of the hearing to four days.

The merits hearing was held on May 23, 24, 25 and 26, 2016, at the offices of MV's counsel in Los Angeles. At the conclusion of the May 26 hearing session, the parties confirmed that they had no further evidence to offer and agreed to submit post-hearing briefs, to be followed by the issuance of an interim award. The parties also agreed that any issues concerning an award of attorneys' fees or costs would be addressed separately after issuance of the interim award.

The parties submitted post-hearing briefs on July 22, 2016 and agreed that this award could be issued on or before August 31, 2016. On or about July 29, 2016, the parties submitted a stipulation for the dismissal with prejudice of MVs remaining claims against Respondent David Reilly, which was approved by the arbitrator.[5]

[4] The court stayed the Federal Action as to defendant Aperture, which was not a party to any arbitration agreement.
[5] This dismissal did not affect the claims against Reilly which had been dismissed *without* prejudice pursuant to Case Management Order No. 6. Prior to the hearing, the parties advised the arbitrator that an agreement in principle

7

Based upon the applicable pleadings and dismissals of certain claims, MV's claims submitted for decision are claims for breach of contract, breach of fiduciary duty, rescission of Amendment No. 1, declaratory judgment respecting commissionability of certain LHS Prospects, unfair competition and intentional interference with prospective economic advantage. LHS's claims submitted for decision are claims for breach of contract and declaratory relief.

## III.  MEDVERSANT'S CLAIMS

Medversant's claims are based on a variety of legal theories as applied to transactions or events concerning specific entities, e.g., Cigna, Molina and Aperture. Accordingly, this Statement of Reasons is organized by transactions or entities.

### A.  Cigna

MV contracted with Cigna in December 2012. Ex. M34. Under the contract, MV undertook to develop a credentialing solution for Cigna's behavioral health, dental and medical networks. MV anticipated receiving as much as $12 million in revenues over four years, with LHS potentially earning over $1 million in commissions.

The negotiations leading up to execution of the Cigna contract were unusual. MV's CEO, Matthew Haddad, was a transactional lawyer with extensive experience in negotiating and drafting contracts. Mr. Haddad reviewed, redlined and signed the Cigna contract. Tr. II:269. However, Mr. Haddad did not negotiate directly with representatives of Cigna. Instead, Marshall Votta of LHS served as an intermediary between Mr. Haddad and Cigna, conferring with Haddad and then communicating MV's positions to Cigna, and vice versa. In the arbitrator's view, neither party produced reliable evidence as to *why* the Cigna negotiations were handled in this manner.[6]

Shortly after the Cigna contract was signed a disagreement arose between MV and Cigna as to whether certain "continuous monitoring" services were included in the contract price or were subject to additional charges by MV. Ultimately, MV acceded to Cigna's position on this issue, and MV embarked on a year-long period of performance under the contract.

Cigna terminated the contract for cause by a letter dated January 31, 2014. Ex. M193. MV's witnesses—Haddad and Noor Alikhan—testified that MV was satisfactorily meeting its contractual obligations and that Cigna had no basis for the termination. However, the documentary evidence showed that at least from April 2013 forward Cigna was regularly expressing dissatisfaction with MV's performance. See Exs. L73, 77, 78, 148, 149, 158. On the arbitration record, it is impossible to determine the merits of this issue. No Cigna witness testified at the arbitration. In any event, it is not necessary to decide whether or not Cigna justifiably terminated

---

had been reached respecting the dismissal of claims against Reilly, and Mr. Reilly did not appear at or participate in the merits hearing.

[6] Haddad testified that Votta of LHS "insisted" that he "stand in between us and Cigna" (Tr. I:71), while Falcone of LHS testified that Haddad requested that Votta play the role of intermediary. No witness testified as to a reason for conducting the negotiations in this manner.

its contract with MV, since Cigna is not a party to the arbitration and the merits of its claims against MV—and vice versa—are not part of this proceeding.

In this arbitration, however, MV contends that <u>LHS</u> brought about the loss of the Cigna business and should be liable for damages suffered by MV as a result of that lost business. The arbitrator believes, and finds, that MV has not met its burden of proving this claim. This claim rests on the assertion that Votta of LHS mishandled the negotiations with Cigna, leading to the dispute over continuous monitoring charges, and that this initial "poisoning of the waters" somehow lead to Cigna terminating the contract over a year later. On the evidence, it is not possible to determine the reason for the disagreement about continuous monitoring charges. Haddad—who was MV's only witness on this subject--lacked first-hand knowledge of the Votta/Cigna communications. Marshall Votta, the knowledgeable LHS employee at the time, did not testify, nor did any of the numerous Cigna employees who worked with MV on the project. After LHS's initial assistance in implementing the Cigna contract, it appears that LHS withdrew from active work on the contract,[7] and the year-long relationship with Cigna was conducted by MV employees, not LHS. Cigna's termination letter identifies "critical failures" by MV to meet performance requirements, but does not mention the continuous monitoring issue or the initial disagreement over charges, which had been resolved early on in Cigna's favor. Ex. M193. Whatever the reasons for Cigna' ultimate termination of the contract, it strains credulity to conclude that LHS's mishandling of the initial negotiations—even if that occurred—brought about the loss of the contract. It is more likely that MV's performance—as evaluated by Cigna—was the cause of the loss. For this reason, MV's Cigna claim fails, whether the claim is framed as breach of contract, breach of fiduciary duty, or interference with economic relations.[8]

## B.  <u>Molina</u>

Molina, a large healthcare company, was interested in providing services for Medicaid (MMIS) and private health plans (MCO) in various states, including West Virginia and New Jersey. LHS worked with MV to interest Molina in subcontracting certain services to MV if Molina succeeded in obtaining contracts from the states. With LHS's participation, MV obtained a contract for services in West Virginia and no claim is made by MV respecting that state.

LHS also helped MV in obtaining a "teaming agreement" with Molina dated July 17, 2013, contemplating a cooperative approach by Molina and MV for MMIS work in New Jersey. Ex. L16. In October 2013, Molina submitted a response to a New Jersey request for proposal that identified MV as a potential subcontractor. Ex. M238. The bid was put on "hold" for a substantial period of time, and was then awarded to Molina in May 2015. Ex. M239. This award did not include the "screening" component that MV anticipated performing. II:388.

---

[7] In April 2013, Haddad and Falcone had an argumentative email exchange about MV's performance of the Cigna contract, in which Haddad told Falcone to "stop work and don't attend any more meetings," and Falcone responded "Fair enough. I'm out." Ex. L53.
[8] Significantly, LHS had every incentive for MV to succeed with Cigna. LHS stood to make more than $1 million in commissions if MV succeeded. There was no evidence of any motive LHS had to interfere with or damage MV's relationship with Cigna.

Meanwhile, in October 2014, New Jersey contacted Optum (thinking that Optum still owned Aperture) and inquired about an Aperture credentialing product known as "Alliance." Ex. L23. Aperture, which by this time was being managed by LHS after its purchase from Optum, made a presentation of the Alliance product to New Jersey.[9] LHS/Aperture heard nothing from the State until about a year later when, in October 2015, Molina contacted Aperture about an interest of New Jersey in potentially using Aperture's unified credentialing model, and Molina and Aperture entered into a letter agreement to further that possibility. Ex. L33. As of the May 2016 arbitration hearing, New Jersey and not committed to the unified credentialing approach and had not awarded any contract to Molina/Aperture.

MV's claim against LHS respecting Molina/New Jersey appears to be founded on theories of breach of contract, tortious interference with advantageous economic relations, breach of fiduciary duty and unfair competition. The claim fails for several reasons. First, by October 2014, when Aperture was contacted by New Jersey about the Alliance product, the Agreement between MV and LHS was "over." Although neither party ever gave formal notice of termination of the Agreement, it is undisputed that neither party was performing under the agreement as of MV's filing of the arbitration in May 2014, and they considered their contractual relationship at an end. Thus, Aperture (now being managed by LHS) was entitled to respond to the inquiry from New Jersey in October 2014. For this same reason, if LHS had ever owed a fiduciary duty to MV, it no longer owed such a duty in October 2014.[10] Similarly, by responding to the New Jersey inquiry in October 2014, Aperture was simply competing with MV (and potentially other interested parties) in seeking the MMIS business from New Jersey. Further, the evidence did not establish that any disinterest of Molina or New Jersey in MV's approach to screening was due to anything that LHS did or said. As with Cigna, there was no testimony at the arbitration from employees of New Jersey or Molina, who would have had first-hand knowledge of New Jersey's and Molina's decision-making processes.[11] Finally, to the extent that Aperture's communications with New Jersey could be characterized as "interference" with MV's prospects in with that state, there is no evidence that Aperture/LHS' conduct was "independently wrongful" or "unfair."[12]

## C. Aperture

MV alleges that LHS breached duties to MV by failing to disclose to MV the opportunity to pursue an acquisition of Aperture in February 2014, and by participating in an investment group that acquired Aperture in August 2014. MV's Aperture-related claims are for breach of contract, breach of fiduciary duty, intentional interference with prospective economic advantage and unfair competition.

## 1. The Evidence

---

[9] LHS followed up with a direct presentation to Molina of Aperture's credentialing capabilities in March 2015.  Ex. L25.

[10] See further discussion of fiduciary duty in Part III(C), below.

[11] Mr. Haddad testified that he had little direct involvement in the negotiations with Molina, which was handled by Ferris Taylor of LHS and Qin Ye of MV.  II:237.  Neither Mr. Taylor nor Mr. Ye testified at the hearing.

[12] As MV concedes, the LHS's covenant in the Agreement not to represent competing credentialing companies, was unenforceable as of October 2014 under California law.  See Business & Professions Code, §16600.

The evidence, which conflicted in some respects, showed the following:

Commencing no later than June 2011, LHS assisted MV in pursuing a business collaboration with Optum and its credentialing division, Aperture. Ex. L95. For more than a year, MV and LHS communicated with Optum about various potential business arrangements. See Exs. L96, 97, 101, 104, 106, 107, 111. A main thrust of the discussions was for MV to provide its automated credentialing services to Aperture, which lacked the technical capabilities that MV could provide. No agreement was reached, and the discussions ended in August 2012, when Optum found MV's price quotes too high and unacceptable. III:635; Ex. L113.

During the 2012 discussions, Benton Davis, an Optum executive, advised MV and LHS that it would either "outsource" its credentialing services or sell the Aperture division. Ex. M25, 27; IV:935. Davis indicated that MV would be given a "first opportunity" to acquire Aperture if Optum decided to sell.[13] Davis's statement of Optum's intentions at the time were never put in writing and were not intended, or understood by MV or LHS, to be legally binding commitments by Optum.[14] Optum's "M&A" department was to be principally responsible for any actual sale of the division. Up to the end of the business discussions with Optum in August 2012, there were no more specific discussions with Optum about MV acquiring Aperture. In the fall of 2012, Benton Davis "went dark" and from that time on there were no serious business discussions between MV and Optum. Ex. L117.

In January 2013, LHS introduced Haddad to Paul McBride, a senior Optum employee. Ex. M81. Haddad and McBride had discussions about the possibility of McBride joining MV if MV acquired Aperture. Ex. L117; I:196-97. In April 2013 Haddad enlisted McBride's help in arranging a call with Davis. On April 16, 2013, Haddad emailed Davis expressing an interest in discussing "a transaction as we previously discussed." Ex. M148. A day or so later, Davis and Haddad spoke by phone. According to Haddad, Davis told him that the sale of Aperture was "still in M&A" and when it came out of M&A "you'll be the first to know." I:217-218. From the evidence, it appears that was the last communication that MV had with Optum about a potential acquisition.

During the 2012-2013 time period, MV advised LHS that MV was interested in acquiring Aperture if Optum decided to sell (e.g., Ex. M172). However, weighing the conflicting evidence, the arbitrator finds that MV did not ask or engage LHS as its agent to pursue such an acquisition. There is nothing in writing reflecting any such request or engagement of LHS. Amendment No. 1 provides for compensation to LHS for arranging an equity investment *in* MV by a third party, but says nothing about LHS assisting in acquisitions *by* MV. Ex. M10, ¶ 9. Haddad did not copy LHS with his 2013 email communications with McBride about a further approach to Benton Davis. III:509; Exs. L118, 121.

On February 5, 2014, LHS received an email from Optum advising that Optum would be selling the Aperture division and inviting LHS to pursue such an acquisition. Ex. L87. This

---

[13] Davis's statement is reflected in a "prospect list" exchanged between MV and LHS in May 2012. Ex. M25, 27; IV:935.
[14] Haddad testified that Davis never put his "first option" commitment in writing, but "it sounded like a promise." III:484.

solicitation of bids was sent to others in the industry. Ex. L161. Optum did not send this announcement to MV.

LHS did not advise MV of the announcement by Optum. Instead, LHS contacted an investment firm, Hughes & Co., and assisted Hughes and its funding entity in pursuing the acquisition. The transaction was negotiated over a period of months, and closed on August 19, 2014. As part of the transaction LHS acquired a minority equity interest in Aperture. LHS also entered into a management agreement to provide business development and marketing services for the company, and Charles Falcone became CEO of Aperture.

Haddad learned of the acquisition from Laura Carabello in early 2015.[15] MV asserted claims against LHS and its principals concerning LHS's participation in the Aperture acquisition in the Federal Action filed in March 2015. These claims were added to this arbitration pursuant to the court's order as set forth above.

2. **Legal Analysis**

    <u>Breach of Contract</u>. MV contends that LHS breached the Agreement by pursuing the Aperture acquisition and by providing business development services to Aperture prior to the closing of the acquisition. MV Closing Br. at 10-11. The evidence did not establish that LHS engaged in actual business development or marketing activities on behalf of Aperture prior to the closing of the acquisition, but rather than LHS had "identified" sales opportunities that Aperture might exploit after the closing. Ex. M214.

    Even if LHS had engaged in marketing activities on behalf of Aperture in 2014, LHS would not have breached contractual duties to MV, because MV had materially breached the Agreement commencing in 2013. The original agreement provided that MV would pay retainers "on the first day of each applicable month." Ex. M5, ¶ 5. The commissions payable by MV were to be paid "within thirty (30) days of the end of the month of Medversant's receipt of revenue from the client." Ex. M5, ¶ 3(b). The evidence was undisputed that MV stopped paying both the monthly retainers and commissions in April 2013, and made no further payments to LHS thereafter. The compensation provisions of the Agreement were highly material, and MV's failures to make these payments were material breaches of the Agreement. These material breaches excused and discharged LHS from its obligations under the Agreement, including any obligations under the covenant not to represent competing entities in paragraph 13.[16]

    <u>Breach of Fiduciary Duty</u>. MV also contends that LHS and its principals breached fiduciary duties to MV by failing to disclose the February 2014 Optum announcement and pursuing the Aperture acquisition without including Medversant. MV Closing Br. at 15. A threshold issue on this claim is whether LHS stood in a fiduciary relationship with MV. MV's theory is that LHS was an "agent" for MV, correctly pointing out that an agent owes fiduciary duties to its principal. *Zalk v. Gen. Expl. Co.*, 105 Cal. App. 3d 786 (1980); *L. Byron Culver &*

---

[15] Carabello was acquainted with both Haddad and Lungen, and had introduced MV to LHS at the outset of their relationship.

[16] Because the parties treated the contract as terminated upon the filing of this arbitration in May 2014, the covenant not to compete was unenforceable thereafter under California law. Cal.Bus. & Prof. Code, § 16600, *et seq.*

*Associates v. Jaoudi Industrial & Trading Corp.*, 1 Cal. App. 4th 300 (1991). However, the evidence in this arbitration did not establish such an agency relationship.

The terms of the Agreement do not help MV. Section 16 of the Agreement, headed "Independent Contractor," provides that "Medversant and [LHS] intend that an independent contractor's relationship shall be created by this Agreement and neither herein shall be construed as creating an employer-employee relationship." Ex. M5, ¶ 16. An essential aspect of an agency relationship is the right of the principal to *control* the activities of the agent. *Michelson v Hamada*, 29 Cal. App. 4th 1566, 1579 (1994) (and cases cited therein). Nothing in the Agreement, or in the conduct of the parties, suggests that MV had the right to control the activities of LHS. Instead, LHS was obligated to perform specified services, and MV was obligated to pay specified compensation for those services. Neither party had any right to control the activities of the other.

MV points out that an agency relationship can be implied from the conduct of the parties. *Michelson v Hamada, supra.* However, the evidence does not establish such a relationship. MV points to evidence that LHS performed services beyond those specified in the Agreement itself, including referring potential employees to MV, performing an "operational assessment" of MV's business operations, and assisting in the implementation of the Cigna contract. Ex. M78; III:681-682. LHS had an interest in MV succeeding with clients originated by LHS, and accordingly sought to assist MV in various ways. However, none of these activities evidence control of LHS by MV or other facts indicating an agency or fiduciary relationship.[17]

The authorities relied on by MV do not support a finding of an agency relationship in this case. A number of these authorities involve real estate brokers or escrow companies, which are routinely held to be agents owing fiduciary duties to their principals. *L. Byron Culver & Associates v. Jaoudi Industrial & Trading Corp.*, 1 Cal. App. 4th 300 (1991); *Spaziani v. Millar*, 215 Cal. App. 2d 667 (1963); *Sierra Pacific Industries v. Carter*, 104 Cal. App. 3d 579 (1980); *Rattray v. Scudder*, 28 Cal.2d 214 (1946). In these cases, there was no dispute that real estate brokers are agents for their clients, and these decisions do nothing to show an agency relationship between MV and LHS. *Zalk v. Gen. Expl. Co.*, 105 Cal. App. 3d 786 (1980), also cited by MV, involved an *employee* of a corporation employed on an exclusive basis to find oil and gas properties and acquisitions for the company. Employees are typically deemed agents of their employer but, as reflected in Paragraph 16 of the Agreement, LHS was not MV's employee.

*Wolf v. Superior Court*, 107 Cal. App. 4th 25 (2003) supports LHS's position. In *Wolf*, the plaintiff had an agreement with Disney for contingent compensation based on movie profits and alleged that Disney failed to properly account for and pay his compensation in breach of its fiduciary duties. The Court of Appeal held that a contractual right to future contingent compensation did not establish a fiduciary relationship, even if Disney had complete control over the business and accounting records relevant to computing the amounts due the writer. In so holding, the Court also stated that the implied covenant of good faith and fair dealing does not create a fiduciary relationship and that all contracting parties to some extent repose "trust and confidence" in each other, but that does not create a fiduciary relationship. The court also noted

---

[17] LHS's occasional references to MV as being its "partner" do not, in the arbitrator's view, change the nature of the parties' relationship. Ex. M12, p. 1. There was no evidence that MV and LHS actually formed a partnership, nor does MV contend that they did.

that profit and revenue sharing relationships are not, as such, fiduciary in nature.  107 Cal. App. 4th at 31.

MV also invokes the corporate opportunity doctrine, contending that the Aperture acquisition was a corporate opportunity usurped by LHS.  That argument fails, however, because the corporate opportunity doctrine only comes into play where a *fiduciary* misappropriates the opportunity.  The decisions cited by MV involved claims against corporate *directors*, who clearly owe fiduciary duties to the corporations they serve.  *Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F. 3d 1388 (9th Cir. 1997; *Kelegian v. Mgrdichian*, 33 Cal. App. 4th 982 (1995).  The corporate opportunity doctrine decisions cited by MV do nothing to show a fiduciary relationship between MV and LHS.

For these reasons, the arbitrator concludes that LHS did not owe fiduciary duties to MV and, therefore, MV's claim for breach of fiduciary duty fails.  Assuming, *arguendo*, that such a fiduciary duty existed, it arose out the contractual relationship between the parties and, therefore, was excused and discharged by MV's material breaches discussed above.

        <u>Intentional Interference with Prospective Economic Advantage</u>   MV alleges that LHS tortiously interfered with "Medversant's Purchase of Aperture."  MV Closing Br. at 25.  As MV acknowledges, a plaintiff alleging an IIPEA claim must show that it was "reasonably probable that the prospective economic advantage would have been realized but for the defendant's interference."  *Id.*, at 26.  To meet this burden, MV stresses that it sought to acquire Aperture, citing its requests to Optum that it be given the opportunity to purse the acquisition.  However, the evidence does not show that <u>Optum</u> was interested in giving MV that opportunity.  MV's extensive discussions with Optum about a business relationship ended in August 2012.  From that time forward Optum, who was aware of MV's interest in acquiring Aperture, did nothing to intiate or pursue acquisition discussions with MV.  Although Davis returned Haddad's phone call in the Spring of 2013, that brief phone conversation, followed by radio silence from Optum, did not evidence any serious interest by Optum in an MV acquisition of Aperture.  Then, in February 2014 when Optum sent out an announcement of its interest in selling Aperture, it sent them to a number of potential bidders—but not to MV.  The most reasonable inference from this evidence is that Optum had concluded that it did not want to pursue selling Aperture to MV.[18]  During the period from 2012 through January 2014, LHS did nothing to discourage Optum from selling Aperture to MV.

Under California law, a plaintiff making an IIPEA claim must show that the defendants conduct was "wrongful" independent of the interference itself.  *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 378 (1995).  Even if MV had a reasonable probability of acquiring Aperture, its IIPEA claim fails, because any interference by LHS by pursuing its own acquisition of Aperture was not independently wrongful (See discussion of breach of contract and fiduciary claims above).

---

[18] Optum's failure to invite MV to bid on Aperture in 2014 suggests either that Optum had never promised to give MV a "first right" to pursue such an acquisition, or that Optum had changed its mind and decided it was not interested in selling Aperture to MV.  No one from Optum testified at the hearing, so it is impossible to know Optum's actual decision-making process.

Underline Competition. California's unfair competition statute prohibits any "unlawful, unfair or fraudulent business act or practice." B&P Code, §17200, et seq. LHS's participation in the acquisition of Aperture was not unlawful or fraudulent. And for an activity to be "unfair" under Section 17200, it must be "conduct that threatens an incipient violation of an antitrust law, or violated the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of law, or otherwise significantly threatens or harms competition." Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 187 (1999). The evidence does not establish any such effects resulting from the Aperture acquisition.

## D.  Rescission of Amendment No. 1

MV contends that LHS fraudulently induced MV to enter into Amendment No. 1 and that there was a "complete failure of consideration" under this amendment. MV Closing Br. at 29-31. The evidence does not support this claim.

In its Consolidated Statement of Claim, MV based its fraud claim on an April 13, 2011 letter, in which Mr. Falcone described expanded services LHS was prepared to provide in return for increased compensation. Cons. St. of Claim, pp. 12-13. In its closing brief, MV focuses on LHS's hiring of an employee, Ragui Selwanes, contending that LHS "led Medversant to believe" that Selwanes was a "permanent member" of LHS and would be handling the marketing of MV "long into the future." MV goes so far as to assert that "Medversant agreed to pay LHS an increased retainer and elevated commissions for one reason and one reason alone: Mr. Selwanes." Closing Br. at 30. In fact, Selwanes left the employ of LSH shortly after MV began paying increased compensation to LHS.

MV's fraud claim lacks credibility. There is no mention of Mr. Selwanes in MV's Third Claim for Relief seeking rescission of the Amendment No. 1. Cons. St. of Claim, pp. 12-13. Nor is Mr. Selwanes mentioned by name in the April 13, 2011 letter which formed the basis for MV's fraud claim in the Consolidated Statement.[19] Moreover, Mr. Selwanes left LHS some six months before LHS executed Amendment No. 1. Had MV been misled by representations concerning Mr. Selwanes, MV could have simply refused to sign the amendment and resume paying the compensation provided for in the original Agreement. Instead, MV executed the amendment and continued its relationship with LHS without objection. Based on the evidence at the hearing, the arbitrator finds that LHS did not induce MV to enter into the Amendment No. 1 by fraudulent representations.

The evidence also fails to establish a failure of consideration warranting rescission of Amendment No. 1. LHS performed the services required of it under that amendment, even after MV stopped paying LHS for its services after April 2013. MV also asserts that Amendment No. 1 lacked consideration "on its face," because it contemplated LHS rendering the services it was already obligated to provide, but at increased compensation. Closing Br. at 30. In fact, as LHS points out, there were numerous provisions of the amendment that differed from the original

---

[19] MV had previously alleged a claim for rescission of Amendment No. 1 for fraud in its Expanded Statement of Claims filed in October 2014. That Statement does not mention Mr. Selwanes or any misrepresentations concerning Selwanes employment with LHS.

agreement, and there clearly was consideration for MV's agreement to increase LHS's compensation. See LHS Closing Br. at 8-9.[20]

### E. Damages

MV seeks to recover damages totaling $9,269,525, allegedly resulting from MV's loss of the Aperture acquisition and the Cigna and Molina contracts. Closing Br. at 36. Because this award finds that LHS has no liability under MV's claims, MV did not suffer legal injury or damage, and it is not necessary to discuss or analyze the damages evidence offered by MV at the hearing.[21]

## IV. LHS'S COUNTERCLAIMS

Under its Counterclaim, LHS alleges that it performed its obligations under the Agreement and is entitled to recover from MV both monthly retainer amounts and commissions based on MV's revenues from four customers—Cigna, AmeriGroup, NDPCP and Molina (West Virginia only). These claims and MV's defenses are discussed below.

### A. Liability

The evidence establishes that LHS performed its obligations under the Agreement. LHS introduced more than 100 potential customers to MV, some of which became clients of MV. Exs. L139, 142; III:624-25. LHS participated in hundreds of meetings and client presentations. Ex. L38; III:620-624. MV does not directly challenge this evidence, but bases it defenses to LHS's claims largely on the alleged breaches of duty by LHS discussed in Part III above. In addition, MV makes certain other criticisms of LHS's performance that merit discussion.

MV asserts that LHS "served two masters" because it expressed, internally, concerns that MV's performance might hurt LHS's long term relationship with important health care companies. MV Closing Br. at 7. MV points to a decision by Lungen in the Spring of 2013 not to market MV to a startup company named Evolent. Ex. M138. In the arbitrator's view, LHS, as a company marketing many clients to large health care companies, had a legitimate concern that MV's difficulties with its customers (Wellcare, Cigna) could jeopardize LHS's credibility with these companies and the industry generally. Also, LHS had valid business reasons to defer an approach to Evolent in the Spring of 2013. IV:996. And under the Agreement, LHS was not obligated to market MV to *every* potential client.

MV also complains that LHS "bad-mouthed" MV in the industry during the course of their relationship. However, the only evidence of such "bad-mouthing" was the testimony of Laura Carabello about Lungen's conversations with her, and internal LHS emails complaining about MV and Haddad. It appears that Ms. Carabello was something of a confidant to both Lungen and Haddad. Assuming that Lungen made derogatory comments about Haddad to Carabello, that did

---

[20] LHS also provided consideration by continuing to perform services. Under the original Agreement either party could terminate for convenience at any time. Ex. M5, ¶ 4(a)(iii). LHS's willingness to continue providing service was consideration for the increased compensation under Amendment No. 1.

[21] MV's claim for declaratory relief concerning the alleged lack of commissionability of certain customers is discussed below in connection with LHS's damages claims.

not amount to making such negative comments to the "industry." There was no evidence at the hearing that LHS made derogatory comments about MV to MV's customers or potential customers, even after MV purported to "terminate" its relationship with LHS in the Spring of 2013 and stopped paying any compensation to LHS.[22]

## B.  Damages

LHS's makes two separate damages claims:  A claim for unpaid monthly retainer amounts and a claim for unpaid commissions.  These claims are discussed separately below.

### 1.  Retainers

The amount of unpaid monthly retainers and unreimbursed expenses calculated by LHS is undisputed.  Ex. L58.   The total amount is $225,161.92.  In its post-hearing brief, LHS reduced this damages claim by $22,500, representing the June 2014 invoice and one-half of the May 2014 invoice.  By this adjustment LHS concedes that no retainers are due for the period following the filing of this arbitration on May 19, 2014.  LHS Closing Br. at 13, n 4.

The arbitrator has concluded that this claim should be further reduced, as an equitable adjustment, to eliminate the monthly retainers for February, March, April and the first half of May 2014.  Although LHS did perform some services for MV during this period, it appears likely that those services were at a reduced level and that LHS was devoting much of its energies during this period to the potential acquisition of Aperture.[23]  With this adjustment, the monthly retainer and expense award is $151,161.92.

### 2.  Commissions

LHS is claiming commissions on MV revenues from four customers—Amerigroup, Cigna, Molina (W. Va.) and NCPDP.  The revenues and commission amounts for these customers are shown on LHS Exhibit 163.  The total unpaid commissions in excess of monthly retainer amounts are $107,557.93.

MV does not quarrel with LHS's revenue and commission calculations, but instead contends that none of these customers were commissionable "Prospects" under the Agreement, so no commissions are owed on these revenues.

The Agreement provides that MV is to pay commissions in the amount of percentages of MV's gross revenues from LHS Prospects.  The Agreement defines the term LHS Prospect in paragraph 2(a), which provides:

---

[22]  In an exchange of argumentative emails between Haddad and Falcone in April 2013, Mr. Haddad concluded the exchange with "consider the Leverage deal terminated." Ex. L53.  MV also stopped making payments to LHS around this time.  Nonetheless, MV continued using the services of LHS throughout the year 2013, and neither party contends that the agreement terminated in April 2013.

[23]  In LHS's retainer and expense summary (Ex. L58), all of the expenses were incurred in 2013 and none in 2014.

17

"'[LHS] Prospects' shall be defined (i) as prospective clients that can use Medversant's current solutions, (ii) with senior leadership of the organizations having expressed a desire to utilize a qualified vendor for Medversant's solutions, (iii) having funds or an identified budget to purchase Medversant's solutions, (iv) that can make a purchasing decision within a six (6) month period and (v) have been reviewed and approved by Medversant via email or other written communication acknowledgment from Matthew Haddad, CEO of Medversant."

Section 2(b) of the Agreement provides:

"If any given [LHS] Prospect is not sold any Medversant solutions within a twelve (12) month period from the time of Medversant approval then such [LHS] Prospect shall not longer be considered a [LHS] Prospect and commissionable unless such failure to sell a Medversant solution was due to Medversant's unwillingness or inability to close in a timely manner."

MV contends that no commissions are owed respecting Amerigroup, NCPDP or Molina, because these customers were never approved in writing by MV as Prospects and, even if they were approved, they lost their status as commissionable customers because the sales were not closed with twelve months of MV's approvals.  MV Closing Br. at 32-35.  MV concedes that Cigna was an approved Prospect, but contends it lost that status because the Cigna contract was entered into more than 12 months after MV's initial approval of Cigna as an LHS Prospect.

Contrary to MV's contentions, Mr. Haddad's May 18, 2012, email to LHS clearly reflects his approval of NCPDP and Molina (and Cigna) as LHS Prospects. Ex. M25.  Amerigroup became an MV customer in April 2012 and generated more than $580,000 in revenues for MV through August 2014. Ex. L163.  Amerigroup appears on sales prospect status reports provided by LHS to MV in 2010 (Ex. L139), 2011 (Ex. L142), 2012 (Ex. M24),  and 2013 (Ex. L153).  Amerigroup was also listed as a prospect on a year-end 2010 "Strategy and Performance" meeting agenda and in a similar year-end agenda memo dated December 27, 2012. Ex. L51.  Amerigroup is specifically listed on an MV "Sales by Client Summary," with associated commission calculations, sent by Haddad to Lungen with a cover email.  Clearly, the approval requirement was met as to the four customers.

MV also contends that these four customers, even if they were approved LHS Prospects, lost that classification because the sales to these customers began more than 12 months MV's approvals of them as LHS Prospects.  The arbitrator accepts LHS's contention that the parties understood, and acted on the understanding, that the 12-month period began to run effective with LHS's last activity.  This is the "practical construction" that the parties put on their contract before any dispute arose.  Any other interpretation would allow MV to obtain the benefits of LHS's services on all four customers and obtain a windfall by not having to pay commissions for these successful services.

MV's contention as applied to Cigna is particularly egregious.  Accepting the testimony of Mr. Haddad, MV allowed LHS to work hard to obtain Cigna as an MV customer, participate in the negotiations of the Cigna contract, and assist in the implementation of the contract, all the while *knowing* that MV could later deny "commissionability" of revenues from the Cigna contract.

18

The arbitrator believes that both parties clearly understood that Cigna was a commissionable customer.

LHS is entitled to commissions on the four customers in the amount of $107,557.93.

DATED: November 9, 2016

Richard R. Mainland
Arbitrator